## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

| | |
|---|---|
| **BARBARA BLAKE,** ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | **JURY DEMAND** |
| vs. ) | |
| ) | |
| **FEDERAL EXPRESS CORPORATION,** ) | |
| **d/b/a FEDEX EXPRESS and d/b/a** ) | |
| **FEDEX FREIGHT** ) | |
| ) | |
| DEFENDANT. ) | |
| ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Barbara Blake ("Plaintiff" or "Blake"), by and through counsel of record, pursuant to Fed. R. Civ. P. 15(a)(1)(A) files her First Amended Complaint herein against Defendant Federal Express Corporation d/b/a FedEx Express and d/b/a FedEx Freight ("Defendant" or "Defendant FedEx") solely to clarify and confirm the only Defendant in this matter is Federal Express Corporation which is d/b/a as FedEx Express and d/b/a as FedEx Freight, and, FedEx Freight is not intended to be named as a separate and independent defendant entity. For the convenience of the parties, with the above clarification made, Plaintiff incorporates her entire original Complaint (ECF No. 1) herein by reference without amendment, and again alleges as follows:

## I.  INTRODUCTION

1.      This is a civil action to make the Plaintiff whole for Defendant's unlawful discrimination against her because of her race, and, unlawful retaliation against her because of her legally protected activities, including making internal complaint(s) about racial animosity

and racially abusive language in the workplace, in violation of Title VII of the Civil Rights Act of 1964, Equal Employment Opportunities Act, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Defendant also sues under 42 U.S.C. § 1981(a)-(b) ("§ 1981") for racial discrimination and retaliation.

## II.  PARTIES

2.      Plaintiff at all times relevant to this Complaint resided in Memphis, Shelby County, Tennessee.

3.      Defendant Federal Express is a commercial entity, incorporated in the State of Delaware, and with its principal corporate address in Memphis, Tennessee. It regularly does business in the Memphis, Tennessee area, and employed approximately 30,000 persons in said area at the time of the facts that form the basis of this Complaint.

4.      Federal Express Corporation conducts part of its operations under the name FedEx Express.

5.      Federal Express Corporation conducts part of its operations under the name FedEx Freight.

## III.  JURISDICTION AND VENUE

6.      Plaintiff brings this action under 28 U.S.C. § 1331, alleging the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and employment law protections.

7.      Venue is proper in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2), because the unlawful employment practices occurred within Shelby County, Tennessee, where Plaintiff formerly worked, where Plaintiff suffered the unlawful employment practices and resultant damages, and where Plaintiff would be employed by Defendant in the absence of its unlawful employment practices.

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.    Plaintiff has met all procedural requirements for filing this Complaint including administrative exhaustion required for jurisdiction in this Court.

9.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and did so within 300 days of the actions of which she complained. Plaintiff filed her Charge for violations of Title VII on March 19, 2024 and an Amended Charge on April 3, 2024.  *See* **Exhibit A - *Charge of Discrimination* and Exhibit B – *Amended Charge.*** On or about May 1, 2025, Plaintiff received her *Right to Sue Notice* from the EEOC, and therefore, concluded the process of her exhaustion requirements with the EEOC. ***See* Exhibit C – *Dismissal and Notice or Right to Sue* (Claim No.: 490-2024-01829).** Accordingly, this lawsuit and supporting Title VII claims are properly and timely filed within ninety (90) days of issuance by the EEOC of Plaintiff's Right to Sue Notice, dated May 1, 2025.

## V.  STATEMENT OF FACTS

10.    Plaintiff Barbara Blake began work as an employee for Defendant in 1997 until 2001.

11.    In 2001, Ms. Blake then then left FedEx for a position as an armed guard in order to meet the requirements for a security position with FedEx.

12.    Blake was rehired by Defendant in August 2004.

13.    Blake began her employment in a security position with Defendant in July 2006, and worked for Defendant in a security role until her termination on or about March 15, 2024.

14.    FedEx Security Officers are responsible for protecting individuals and property from injury and/or criminal acts; preventing unauthorized entry and responding to emergency situations; and performing other duties as assigned.

15.    Between 2007 and 2018, Blake worked in Defendant's Armory, issuing

weapons to Defendant's security officers, maintaining inventory for cash, drugs, and weapons shipped through the packaging sort.

16.    Between 2018 and her termination in 2024, part of Blake's work duties included working personal security detail for Mr. Fred Smith and other of Defendant's executives, including guarding the perimeters of their homes, having access to their security gate and building codes, and responding to burglar alarms.

17.    At the time of her termination, Blake performed her security work duties at Defendant's property located at 3640 Hacks Cross Road, Memphis, TN 38125.

18.    When performing her work duties, Defendant provided Blake access to a firearm (a Glock 17), pepper spray, handcuffs, and a steel ASP baton.

19.    Blake had access to these weapons until her final day of work on February 29, 2024.

20.    At the time of her termination, Security manager Mr. Darrell Jackson (Black) (Jackson) was Ms. Blake's immediate supervisor. Ms. Avis Buford-Darling, Sr. (Black) (Buford-Darling) was her senior manager, and Ms. Jaime Phair (White) (Phair) was her managing director. Ms. Wanda Granville (Black) (Granville) was Ms. Blake's HR advisor.

21.    At the time of Blake's termination, Defendant used a progressive discipline policy. Specifically, Defendant's employees may be issued discipline in the form of Warning Letters, or Performance Reminders, three of which such Letters or Reminders will normally result in termination. A Warning Letter or Performance Reminder  remain effective against the employee for one year.

22.    Defendant's management allowed themselves wide discretion under the progressive discipline policy. If management did not want to issue formal discipline, they could issue a non-documented verbal warning, or documented counseling (Online Compliment or

Counseling ("OLCC"). Three OLCCs would lead to a Warning Letter or Performance Reminder.

23.     Blake's position was a full-time *Security Officer Armed* with Defendant at the time of her termination.

24.     At the time of Blake's termination, her compensation was approximately $82,000 per year, plus benefits.

25.     Blake incurred no formal discipline from Defendant between 2004 and January 3, 2022, when she was issued an OLCC.

26.     On December 23, 2021, Blake directly informed her manager, Darrell Jackson that her co-worker Johnny Skeen (White) was making offensive racial comments in the presence of herself and other Black co-workers on December 20, 2021. Specifically, Blake explained to Jackson that Skeen used racially offensive language regularly, including referring to Black people using terms such as "nappy headed" and "heathens", and he bragged about a beating of a Black woman while he was a police officer.

27.     Specifically, on December 23, 2021 Blake told Jackson that on December 20, 2021 Skeen had also stated aloud while he was in the Squad Room that a Black person of interest on the TV was a "terrorist threat." Blake responded to Skeen that she felt Skeen always used extreme descriptions when describing Black people. Skeen replied "I'm not racist" to which Blake explained, "you continuously make racist remarks."

28.     As a result of the aforementioned interaction between Blake and Skeen on December 20, 2021, Skeen also reported Blake to Jackson for offending him.

29.     Blake asked Jackson to investigate her claims against Skeen by interviewing fellow officers. Jackson refused. Instead, as a result of their interaction on December 20, 2021 described above, Jackson decided to meet Blake and Skeen on December 29, 2021 and issued

an OLCC on January 3, 2022 to both Skeen and Blake, respectively.

30.    At the time these OLCCs were issued to Blake and Skeen, Skeen already had a history of discipline in the past 12 months.

31.    The OLCC issued to Blake by Jackson was based on Blake's protected activity in reporting racial harassment and abuse, and thus was unlawful and retaliatory.

32.    Blake continued to prove herself an exemplary employee and was awarded a Bravo Zulu Award by Jackson, Buford-Darling, and Senior Manager Sean Driver for her special patrol detail on May 15, 2022 at the home of Defendant Executive Vice President Rob Carter.

33.    On July 28, 2022, Blake was awarded a Bravo Zulu Award by Jackson, Buford-Darling, and Senior Manager Sean Driver for her observations on July 28, 2022 of Defendant's executive home residence left open and vulnerable to burglary, and again on August 6, 2022 for her quick response leading to the transport of a "mental consumer" by Memphis Police Department close to Defendant's executive residences.

34.    In January 2023, Blake sought a transfer and began working at FedEx Freight.

35.    Specifically, Ms. Blake sought the transfer to get away from Skeen, who continued to make provocative racially charged remarks in the workplace throughout 2022 that were not addressed by management.

36.    For example, Skeen often called Black male security officers, "boys" and used the term "nappy headed" about Black female coworkers.

37.    Blake was greatly offended by Skeen's ongoing racially abuse and offensive comments, but was afraid to report them again because she did not want to face another OLCC, and further retaliatory discipline or treatment from Defendant's management.

38.    Additionally, on March 21, 2023, Skeen sent an email to all Defendant's security

officers and management that he was told by Defendant's executive's husband (Mr. Branning) to inform all Defendant's officers that he and his wife had "given a couple of black children" permission to play basketball in their driveway. On March 22, 2023, Blake, while FedEx Freight, responded privately to Skeen that his email was 'Totally unappropriated and offensive." (sic).

39.    Skeen complained to Jackson about Blake's aforementioned email response to him on March 22.

40.    On March 22, 2023, at 5:54 am, Jackson emailed Blake to state, "Thanks. This has been rectified."

41.    Blake replied to Jackson on March 22 at 6:30 am, that, "Skeen's offensive behavior and comments have been and are currently ongoing" and part of Skeen's "many racist and offensive statements."

42.    On March 27, 2023, Jackson issued Blake another OLCC because during Blake's conversation with Jackson about Skeen's offensive email, Jackson advised Blake not to respond to Skeen's emails in the future if she found them to be offensive. However, Blake objected and asserted she had the right to reject, object and oppose emails from Skeen containing racist language.

43.    This OLCC referenced above was based on Blake's protected activity in opposing and reporting unlawful racially harassing comments and conduct of Skeen. The OLCC was thus unlawful and retaliatory.

44.    Disturbed by Jackson's unwillingness to address Skeen's racist conduct, and his decision to issue her an OLCC in an attempt to silence her complaints about said racially harassing conduct, Blake obtained the statement of FedEx security officer Jasmine Wright (Black female) on March 30, 2023, about Skeen's degrading comments, especially toward

7

African American women such as calling them "nappy headed." Wright remains a FedEx employee, specifically with Human Resources at Defendant's World Headquarters.

45.    Wright's statement noted that Skeen had said he was going to get Manager Jackson "in check," that Skeen continued to address his Black co-workers as, "hey you heathens," and that officers no longer watched the news in the squad room because of Skeen's comments such as "they got what they deserved" in response to news reports only about the killing of African Americans and not persons of other races.

46.    Wright's statement also explained that Blake was Skeen's "main target."

47.    Disturbed by Jackson's unwillingness to address Skeen's racist conduct, and his decision to issue her an OLCC in an attempt to silence her complaints about said conduct, Blake obtained the statement of former FedEx security officer Regina Smith (Black female) on April 3, 2023 about her personally witnessing Skeen make racist comments, calling her and Officer Coppage "nappy headed", and that he referred to Black females as "Aunt Jemima."

48.    Disturbed by Jackson's unwillingness to address Skeen's racist conduct, and his decision to issue her an OLCC in an attempt to silence her complaints about said conduct, Blake obtained the statement of former FedEx security officer Lenard Willis (Black male) on April 4, 2023, confirming that when he was a FedEx employee, he witnessed Skeen make several inappropriate comments about race, prompting Willis to tell Skeen that his comments were racist.

49.    On June 26, 2023, after several weeks of hesitation by Blake on whether to formally pursue her complaints against Skeen and Jackson to Jackson's superiors, Blake emailed Buford-Darling to request a meeting with her to discuss her concerns regarding the two OLCCs that she had received from Jackson because of her protected complaints. Blake attached a one page written complaint detailing Skeen's ongoing racist comments and inappropriate

8

behavior in the workplace, and, Jackson's failure to follow company policy by not investigating her complaints against Skeen, thus causing and perpetuating a racially hostile work environment.

50.     In support of her written complaint to Buford-Darling, Blake provided the three written statements referenced in Paragraphs 42 through 46 above to Buford-Darling.

51.     Almost immediately thereafter, on July 9, 2023 Blake was moved back to Defendant's World Head Quarters from FedEx Freight. As a result, Blake was again required to work directly with Skeen.

52.     As a result of her complaint in June 2023, Blake met Buford-Darling on August 22, 2023. At this meeting, Blake provided her collected statements referenced in Paragraphs 42 through 46 above along with her written complaint which Buford-Darling already had. Buford-Darling stated that she would need to get back to Blake on the complaint.

53.     On September 7, 2023, Blake again met with Buford-Darling. At this meeting, Blake complained to Buford-Darling that she believed Jackson was giving her a hard time and his demeanor was now hostile toward her because Blake had previously reported the racist and conduct of Skeen, along with Jackson's failure to address it and his retaliatory conduct toward her.

54.     Jackson's retaliatory hostility began after he had issued the OLCC to Blake for reporting Skeen's racist conduct, and Jackson's hostility increased after Blake's protected complaint in June of 2023.

55.     On September 7, 2023, at the meeting between Buford-Darling and Blake, Buford-Darling told Blake, "I see Skeen is getting on your nerves" but that Human Resources would not allow use of written statements obtained by Blake to confirm racist language by Skeen because the statements were from previous employees of Defendant. Buford-Darling

also told Blake at this meeting that Blake should not conduct her own investigation into Skeen's racist conduct. In response, Blake pointed out to Buford-Darling that Jasmine Wright remained a current FedEx employee and her statement referenced other current FedEx employees, Arthur Taylor and Wanda Dawson, who all witnessed Skeen's racist conduct.

56.    Blake's complaint to Buford-Darling of racial and retaliatory harassment was ignored by Defendant and no counseling or retraining was provided to Skeen or to Jackson.

57.    On October 10, 2023, Blake reported accidentally scratching a squad vehicle for the first time in her career at FedEx to Manager Ron Russell, who was covering for Jackson while on vacation. Blake also provided photographs of the scratch to Russell. Russell told Blake it was no big deal, and did not issue her an OLCC despite having the authority to do so.

58.    Another example of Jackson's retaliatory conduct occurred on October 25, 2023. On October 25, 2023, back from vacation, Jackson requested Blake to attend the main gate alone to wait on a terminated employee who was coming back to the works site to retrieve his personal belongings.  Blake replied to Jackson that there had been a prior shooting by a former FedEx employee at its Indianapolis location and she was concerned about meeting the former employee without another officer present because being alone would mean an unnecessarily heightened risk of danger to her, as well to Defendant's other employees on campus.

59.    According to Defendant's training provided every 6 months to Blake and its other security officers, including Jackson, by Shelby County Sheriff's Department, the personal safety of officers is consistently emphasized as the top priority for officers.

60.    On October 26, 2023, Jackson met Blake in the squad room, and Blake again explained she felt it was unnecessarily dangerous to meet a terminated employee alone based on FedEx training and Jackson's past practice of not requiring Defendant officers, including

those who were retired law enforcement officers, to go out alone to meet terminated employees after they refused to do so. In this meeting, Jackson also told Blake to sign off on an OLCC for the vehicle scratch that occurred October 10, 2023 and provided a *Notification of Judgment*.

61.    Blake believed the OLCC was a retaliatory action by Jackson for her complaints to Buford-Darling about Jackson's failures to correct Skeen's racist conduct. As a result, she refused to sign the OLCC paperwork.

62.    Blake's belief about the OLCC being an act of retaliation by Jackson was confirmed when on November 2, 2023, Skeen admitted to damaging a tire on a company vehicle and then refusing to obtain a repair because *"First shift doesn't do anything."* The vehicle in question was known by Skeen to be regularly driven by Blake who worked on First Shift. Nonetheless, despite Skeen admitting his refusal to obtain a repair to Jackson, Jackson did not issue an OLCC or any other discipline to Skeen.

63.    On October 26, 2023, Blake emailed Managing Director Phair with the title, "Urgent", requesting a meeting at Phair's earliest convenience. As a result, Blake met Phair and told her about her desire to file an internal EEO about Skeen and Jackson's behavior, and the hostile work environment she faced based on racial harassment and retaliation for her protected activities when objecting to the same.

64.    On November 3, 2023, Phair emailed Blake on Defendant's procedure for filing her internal EEO, and informing Blake that Phair had shared Blake's desire to file an EEO with Wanda Granville and Buford-Darling.

65.    On November 8, 2023, Blake filed an internal EEO about the unaddressed and ongoing racist conduct and statements of Skeen, and repeated retaliation by Jackson, including harassment, abuses of his authority, and his use of issuing OLCCs to intimidate Blake into silence about Skeen's racist conduct. Blake's EEO offered the names of current FedEx Officers,

11

Wanda Dawson, Jasmine Wright, Shundrica Sayles, and Arthur Taylor as witnesses to Skeen's inappropriate racist remarks.

66.    Blake's internal EEO was assigned for investigation by managing director, Peter Varcadipane.

67.    Jackson and Skeen, motivated by retaliatory animus, and those acting in concert with them thereafter tried to have Blake discharged because of Blake's protected activity.

68.    On November 20, 2023, Donna "Ivy" McCraney (Black female) falsely reported to Jackson that she heard Blake say, "I'm going to get rid of Jackson." At the time of this false allegation by McCraney, Jackson was aware McCraney personally disliked Blake.

69.    On November 20, 2023, following a meeting between Jackson, Blake, and McCraney, Blake emailed Jackson to confirm her denial of McCraney's allegation in their meeting, specifically, "I Officer Barbara Blake #294893 did not say anything to nor about Officer Ivy McCraney."  Blake's complaints about Jackson were that he failed to address the racial conduct of Skeen and that Jackson retaliated against Blake for complaining about Skeen's racial conduct and Jackson's retaliation. All of Blake's comments were protected activity.

70.    On November 27, 2023, Defendant claims its security manager Chuck Lewis received a complaint from Blake's managing director Jaime Phair that Blake had commented in front of several of her colleagues that she was going to "get rid" of security manager Jackson. This was the same alleged statement falsely attributed to Blake and which she had already received an OLCC from Jackson.

71.    When interviewed by Lewis, Blake denied making any such comments that she wanted to "get rid of" Jackson.

72.    Lewis also audio-recorded an interview with Jackson, who claimed McCraney first claimed to him that Blake was conspiring against him with Officer Blue.

73.     Jackson twisted the lawful and protected objections of Blake to racial discrimination and retaliation and Jackson's failure to address both to claim that they  mean that Blake somehow intended to do physical harm to Jackson. Jackson also admitted to Lewis that Jackson knew Blake was not pleased with Jackson's treatment of Blake.

74.     At this point in time Jackson knew that Blake had filed an EEO complaint against him and made other complaints about his refusal to address and correct the racist conduct of Skeen.

75.     Ignoring the evidence to the contrary, Lewis concluded that Blake was heard by one witness stating "I'm gonna get rid of him no matter what I have to do," and that she also made other negative comments about Jackson. Lewis provided no context in his investigation that Blake's alleged negative comments were in fact protected complaints to and about Jackson for his refusal to address and correct the racist conduct of Skeen.

76.     As a result of her alleged negative comments about Jackson, despite them being protected complaints by law, Jackson issued Blake an OLCC on November 30, 2023 for not adhering to policy and not *"conducting appropriate conversation in the workplace and how to appropriately bring any type of concerns to your management chain, manager, senior manager, managing director or HR Advisor."*

77.     When issuing the OLCC to Blake, Jackson was aware that Blake had filed an EEO complaint against him and made other complaints about his refusal to address and correct the racist conduct of Skeen.

78.     Meanwhile, despite the claim by McCraney that Officer Blue was conspiring against Jackson, Jackson did not issue Officer Blue an OLCC or discipline.

79.     Officer Blue has never filed an EEO complaint against Jackson, or complained to Buford-Darling or Phair about Jackson's refusal to address and correct the racist conduct of any officers, including Skeen.

80.     On December 5, 2023, Blake emailed Human Resource Advisor Wanda Granville that, "I just wanted to inform you that, today at approximately 2:40 pm, Officer Skeen entered the squad room and stated, 'Y'all be careful what you say, people got soft skin and you might hurt their feelings. I found out the hard way." Sr. Officer Blue, Sr. Officer Hayes, Officer M. Harris and I were present."

81.     That same day, Granville confirmed receipt of Blake's email.

82.     On December 6, 2023, while Blake was talking to officer Bridgeforth (Black male), Skeen approached them and stated to Bridgeforth, "you work today? They didn't hurt your feelings, did they?" Skeen then stared at Blake. As a result, Blake told Jackson that Skeen was continuing to make inappropriate remarks to her about her EEO complaint against Skeen's racist comments and conduct.

83.     On December 6, 2023, following Blake's complaint, Jackson issued a Warning Letter to Skeen with paid suspension for his inappropriate comments made in the workplace. Skeen was not suspended for his racist comments or racist epithets, but instead, for derisive comments he made in squad room in front of Blake and her co-workers about Blake's internal EEO complaint. At this time, Jackson was aware Blake had filed an EEO complaint against him for refusing to address the racist conduct and harassment of Skeen.

84.     On January 5, 2024, Granville contacted Buford-Darling about an alleged second complaint about Blake. Specifically, security officer McCraney made a complaint that she was afraid of Blake, in part, because she claimed to see Blake taking photographs of McCraney's personal vehicle at the end of her shift. McCraney's complaint was false.

14

85.     Again on January 7, 2024, security officer McCraney allegedly complained to Jackson that she feared for her safety and the safety of others because of Blake's alleged comments about Jackson. Jackson was aware this complaint had no credibility and, unlike McCraney previous identical false allegation, Jackson decided not to meet with Blake and McCraney together to clarify the facts. At this time, Jackson was aware of Blake's EEO complaint against Skeen and himself.

86.     On January 8, 2024, Blake met with Managing Director Peter Varcadipane about her EEO complaint. Varcadipane told Blake that he believed Skeen made the racist comments, but told Blake, next time, she should bring her concerns directly to Jackson in-person and avoid making complaints in emails or other written communications. Varcadipane stated one of Blake's emails appeared to be challenging Jackson's authority.

87.     On January 8, 2024, after her meeting with Managing Director Peter Varcadipane, Blake emailed Varcadipane, stating, "During our conversation, I forgot to mention Mgr. Terrell Been' (sic) 901-500-8467.  I spoke to him a while ago about my concerns. He advised that I request that HR contact him regarding my concerns." Varcadipane however, did not respond to Blake's email and did not interview Mgr. Terrell Been.

88.     On January 8, 2024, as a result of the investigation by Varcadipane into Blake's EEO complaint, Defendant determined its Memphis based security team should be retrained, including Jackson, on acceptable conduct and anti-harassment policies.  Plaintiff was not included in any such training and was not advised that it occurred during the remainder of Plaintiff's employment.

89.     On Wednesday, January 10, 2024, Blake emailed Jackson, "Per. [sic] our conversation Monday, were you able to view the footage from the Armory camera?" Blake requested Jackson review the camera footage because it would show McCraney attempting to

physically walk into Blake in an effort to begin an altercation, in contrast to McCraney's claims that she was afraid of Blake. Jackson replied within 7 minutes to state, "As discussed, I did review the footage of the Armory camera." At this time, Jackson was aware Blake was truthfully recounting McCraney's aggressive behavior and her claim that she was afraid of Blake was false.

90.     Nonetheless, on January 10, 2024, after viewing the "footage of the Armory camera" Defendant placed Blake on investigative suspension, allegedly, based on the letter issued to Blake by Buford-Darling, "to allow us time to investigate the facts related to this situation."

91.     The letter placing Blake on investigative suspension, signed by Buford-Darling also stated, "While on investigative suspension, you are not to contact any FedEx employee or customer nor are you to enter any FedEx facility without permission of management, except by mail or receive FedEx packages at the customer counter."

92.     Blake signed for receipt of this documented suspension, dated January 10, 2024. However, Blake told Buford-Darling that she had already been reprimanded for these false allegations and the suspension was like double-jeopardy. Buford-Darling replied, this suspension is for "a whole other investigation" into whether Blake was taking photographs of McCraney's vehicle.

93.     As a result of Buford-Darling's claimed focus of her new investigation, Blake immediately allowed Buford-Darling to look through photographs in her personal cell phone, confirming no such photographs existed of McCraney's vehicle or any other inappropriate photographs. In fact, Buford-Darling instead focused on photographs of food from Blake's New Years Eve party and complimented Blake on how good the food appeared.

94.     Buford-Darling allegedly investigated the allegations made by McCraney against Blake while Blake was on suspension. However, after observing no such photographs existed of McCraney's vehicle, Buford-Darling reviewed no other alleged evidence because no such evidence existed. Instead, Buford-Darling decided to again investigate the alleged comments falsely attributed to Blake about Jackson and for which she had already received an OLCC. At this stage, Buford-Darling was aware of Blake's EEO complaint against Jackson for refusing to address the racist conduct and harassment of Skeen.

95.     Meanwhile, Defendant's investigation into Blake's EEO complaint concluded on January 25, 2024, while Blake remained on suspension.

96.     The next day, on January 26, 2024, Buford-Darling produced her written findings of her investigation to Phair and Granville based on her interviews with about eleven security officers selected by Buford-Darling between January 8, 2024, and January 23, 2024. At this stage, Buford-Darling was aware of Blake's EEO complaint against Jackson for refusing to address the racist conduct and harassment of Skeen.

97.     Buford-Darling's written findings stated that officer McCraney had alleged that she was told by two security officers that Blake had said "he [Jackson] has got to go, whatever I have to do, he has got to go."

98.     In her written report, Buford-Darling also stated that three Senior Security Officers, including Blue, Falkner and an unnamed female state they had not heard Blake comment that she wanted to "get rid of" Jackson, though Blue confirmed Blake was critical of Jackson for his handling of Skeen's racist conduct.

99.     In her written report, Buford-Darling stated Senior Security Officer Hayes commented that he heard Blake say "we can all get together and get rid of Jackson" but he thought the comment was about a different manager.

100.    In her written report, Buford-Darling also stated that Officer Layrock asserted Blake did not like Jackson. However, Layrock provided no specific facts or examples in support of his opinion.

101.    In her written report, Buford-Darling also stated that one officer said Blake was critical of Jackson for issuing her an OLCC and wanted to make a claim against Jackson.

102.    In her written report, Buford-Darling also stated that at least two officers stated Blake had said she was going to file an EEOC complaint against Jackson.

103.    In her written report, Buford-Darling also stated that one officer asserted he heard Blake state she "would do whatever she could to get rid of Jackson."

104.    None of the officers interviewed by Buford-Darling were named to Blake, and Blake was denied any opportunity to refute any specific factual allegations by said officers.

105.    Of those security officers interviewed by Buford-Darling, none claimed that Blake intended any physical harm to, or threatened to perform any physical harm on Jackson or any other person. Instead, it was plain from the interviews, and Buford-Darling's personal knowledge, that Blake had only made complaints about Jackson, including her EEO complaint, because of his refusal to address the racist conduct and harassment of Skeen.

106.    During the investigation by Defendant into Blake's EEO complaint, Defendant conducted no interviews of Blake's Black co-workers named by Blake in her EEO complaint, specifically Officers Wanda Dawson, Jasmine Wright, Shundrica Sayles, and Arthur Taylor as witnesses to Skeen's inappropriate racist remarks and conduct.

107.    On February 14, 2024, Jackson called Blake into his office, while she remained on suspension, and with no other witness present, began questioning Blake about escorts and responding to suspicious activity at an Executive's home.

108.    Blake returned to work on February 24, 2024 after a 6-week suspension. She was issued no disciplinary action on her return.

109.    After returning to work however, Blake was subjected to immediate harassment by Defendant's management and again suspended on February 29, 2024.

110.    On February 26, 2024, Blake was working at World Headquarters while McCraney was working at FedEx Freight, and Blake had not encountered or observed McCraney since the date of her suspension back on January 10, 2024.

111.    On February 26, 2024, Defendant management claims it received an alert line anonymous complaint that Blake had violated Defendant's workplace violence policy. This complaint was false.

112.    On February 27, 2024, Defendant management claims it received a second alert line anonymous complaint about Blake's use of threatening language. This complaint was false.

113.    At this stage, Defendant management was aware the complaint made by McCraney and two anonymous complaints were plainly false and Blake was being personally targeted and harassed because of her EEO complaints including her criticism of Jackson and management for failing to deal with the racial statements and conduct about which Blake had complained.

114.    On February 29, 2024, at 6.45 a.m., Jackson met Blake and asked if she had completed her escort training, and if not, he needed her to do it today. He then asked Blake to meet with Senior Security Specialist Lou Pagano in the conference room. Pagano asked Blake if she had made any threats about FedEx employees and Blake denied the claims. Pagano asked Blake to write a statement to confirm her denials and then asked her to read it aloud for an audio-recording. Pagano then exited the room and Jackson entered. Jackson sat next to Blake and explained he was again placing her on investigative suspension, with pay, due to the alleged

19

possible violation of the Defendant's acceptable conduct policy. Blake replied, "Lord, have mercy, are you serious?" While smirking and plainly amused, Jackson confirmed he was serious and that he was going to now escort Blake out of the building. Upset and speechless at this treatment, Blake followed Jackson's direction and left the building.

115.    The document placing Blake on suspension stated that the suspension was "to allow us time to investigate the facts related to this situation." However, there was no investigation into the allegations against Blake and no interviews were conducted.

116.    The document also stated, "While on investigative suspension, you are not to contact any FedEx employee or customer nor are you to enter any FedEx facility without permission of management, except by mail or receive FedEx packages at the customer counter."

117.    Blake remained on suspension until March 15, 2024, when she was ordered to meet with Sr. Manager Buford Darling.

118.    At the meeting on March 15, 2024, Buford-Darling issued Blake a notice of her termination and asked Blake to contact Manager Jackson to turn in her uniforms and retrieve any personal belongings.

119.    Defendant claims it terminated Blake because of the volume of complaints about Blake's conduct, and the substantiation of her use of threatening language in the workplace.

120.    The Termination Letter issued by Defendant to Blake falsely alleges that on January 5, 2024, Blake made "inappropriate communications with [her] peers" at WHQ that were "deemed as threatening and has created a hostile work environment."

121.    Blake did not work at WHQ on January 5, 2024, but instead was actually working overtime on her day off at Defendant's Hub. Jackson was aware that at no time on January 5, 2024 was Blake present at WHQ.

122.    Following her termination, on March 21, 2024, Blake filed a GFTP complaint to challenge the basis of her termination. Blake's GFTP complaint noted she did not work at the WHQ on January 5, 2024, and reiterated she was the victim of a hostile work environment because she had reported her co-worker officer Skeen for his references to Black females as "nappy headed heifers."

123.    On April 2, 2024, Phair met with Blake in-person to discuss Blake's GFTP complaint.

124.    During this meeting between Phair and Blake, Blake offered to show Phair the contents of her personal bag before she entered Defendant's property on account of the allegation against her, but Phair responded, "no need, I trust you."

125.    At this meeting between Phair and Blake, Phair informed Blake that she had the option to uphold or dismiss Blake's termination. Phair also confirmed again that Blake's complaints about Skeen's racist language and conduct could not be investigated because her claims were based on "hearsay."

126.    On April 8, 2024, Phair upheld the decision to terminate Blake.

127.    Throughout the course of her employment, Plaintiff provided loyal and diligent service to Defendant.

128.    Plaintiff will establish there was a White employee (similarly situated co-workers to Plaintiff) based at the same facility where Plaintiff was employed, and under the supervision of the same management, during the period of December 21, 2021 and the termination of her employment who, without incurring any or similar discipline, used profane and demeaning racist language and engaged in alleged misconduct (similar to what is alleged against Plaintiff but which Plaintiff denies) but was not suspended or terminated.

129.    Plaintiff will establish there were employees (similarly situated co-workers to

Plaintiff) based at the same facility where Plaintiff was employed, and under the supervision of the same management, during the period of December 21, 2021 and the termination of her employment who, did not make internal complaints about racist harassment and management's failure to address such harassment, including filing an internal EEO complaint, all lawfully protected activities, who did not incur any or similar discipline for similar conduct alleged against Plaintiff but which Plaintiff denies, or face suspension or termination. Following her EEO complaint in November 2023, Plaintiff, an employee of Defendant for over 20 years, was suspended twice and then terminated within 3 months based on knowingly false and bogus reasons as pretext for Defendant's unlawful retaliation.

130.    Plaintiff will establish the actual reason for her disciplinary action, and subsequent suspensions in January and February 2024, and then termination in March 2024, was unlawful retaliation by Defendant's management because Plaintiff reported discriminatory actions and behavior toward her and her Black female coworkers, including in an internal EEO complaint in November 2023.

131.    Additionally, the subsequent review or investigation process allegedly undertaken by Defendant following the termination of Plaintiff was improperly influenced by Defendant's management, through easily verifiable misinformation and omissions of other relevant information.

132.    As a result of Defendant's counseling, suspensions and termination of Plaintiff, Plaintiff suffered loss of pay, embarrassment, humiliation, emotional distress, and damage to her reputation.

133.    Defendant's actions and omissions taken against Plaintiff as stated above are violations of Title VII and § 1981, and were knowing and intentional, willful, malicious, and reckless.

134.    Plaintiff has been deprived of employment opportunities, and has otherwise been subjected to Defendant's intentional discrimination and retaliation, regarding her rights under Title VII and § 1981, which has caused Plaintiff to suffer economic losses including lost wages and benefits, as well as future pecuniary losses, interest, reasonable attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, the loss of health insurance despite a known heart condition, and other nonpecuniary losses and damages, in violation of Title VII and § 1981,  prohibiting discriminatory and retaliatory treatment and termination.

### IV. CAUSES OF ACTION UNDER TITLE VII AND § 1981

### FIRST CAUSE OF ACTION
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e-2 *et seq.*, (Title VII)

135.    Plaintiff repeats, re-alleges, and incorporates the paragraphs above as if fully set forth herein.

136.    Defendant discriminated against Plaintiff on the basis of her race in violation of the Title VII of the Civil Rights Act of 1964, including 42 U.S.C. § 2000e-2.  Specifically, Defendant discriminated against Plaintiff based on her race in that Plaintiff is African-American or Black.

137.    Defendants' conduct violates Title VII and its prohibition of race discrimination as provided by 42 U.S.C. 2000e-2(a)(1)-(2).  Title VII provides:

It shall be an unlawful employment practice for an employer—

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment

23

in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. 2000e-2(a)(1)-(2).

138.    As pleaded above, Defendant's conduct of race discrimination and harassment caused damages to Plaintiff.    Pleading in the alternative, Plaintiff's race was at least a motivating factor in Defendant's conduct and caused damage to Plaintiff.

139.    As pleaded above, Defendant's race harassment and discrimination included adverse actions.

140.    As pleaded above, Defendant also subjected Plaintiff to a racially hostile work environment and then retaliated against her for complaining about it. The harassment was severe or pervasive.

141.    As pleaded above, Plaintiff subjectively did find, and a reasonable person as well would have found, the racially harassing conduct to be offensive and severe or pervasive.

142.    As pleaded above, the racial harassment and conduct was such that submission to or rejection of it constituted a term and condition of Plaintiff's employment, submission to or rejection of such unlawful conduct was used as a basis for employment decisions affecting Plaintiff and/or such conduct had the purpose or effect of unreasonably interfering with Plaintiff's performance of her job and/or creating a hostile, intimidating or offensive work environment.

143.    As pleaded above, Defendant failed to take reasonable steps to prevent the conduct or to address it after Defendant knew of it or should have known of it.

144.    Defendant disciplined Plaintiff for complaining about the racial harassment.

145.    As pleaded above, Defendant's violation of Title VII injured and damaged the

Plaintiff so that Plaintiff suffered damages caused by the racial discrimination and harassment.

146.    Defendant has intentionally, deliberately, willfully, and callously disregarded the rights of Plaintiff.

147.    By reason of the Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 2000e, *et seq.*

148.    Defendant is liable to Plaintiff for compensatory damages, including for injury from humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, backpay, equitable relief, injunctive relief, attorney's fees, expenses, costs and such other damages and relief as the jury or the Court determine to be appropriate.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e-3 et seq.,
## (Title VII)

149.    Plaintiff repeats, re-alleges, and incorporates the paragraphs above as if fully set forth herein.

150.    The Defendant retaliated against Plaintiff in violation of the Title VII, 42 U.S.C. § 2000e-3, which provides:

> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.** It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment … because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

> 42 U.S.C. § 2000e-3.

151.    Plaintiff acted in good faith with a reasonable belief that she was opposing unlawful race discrimination or racial harassment or unlawful retaliation or retaliatory harassment by co-workers or by supervision.

152.    As pleaded above, Defendant's retaliation included adverse actions. The Defendant retaliated against Plaintiff for participating in protected activity and availing herself of Defendant's internal EEO process, and by subjecting her to adverse employment actions including unlawful termination.

153.    As pleaded above, Defendant also subjected Plaintiff to a hostile retaliatory work environment by both co-workers and supervisors and then further retaliated against Plaintiff for complaining about it. The retaliation included tangible employment losses and actions.

154.    All these actions, individually and collectively, were such that they would tend to dissuade a reasonable person from engaging in protected activity in opposing the unlawful activity of Defendant.

155.    As pleaded above, the retaliatory harassment was severe or pervasive. Further, Plaintiff subjectively did find, and a reasonable person as well would have found, the retaliatory harassing conduct to be offensive and severe or pervasive.

156.    As pleaded above, the retaliatory harassment and conduct was such that submission to or rejection of it constituted a term and condition of Plaintiff's employment, submission to or rejection of such unlawful conduct was used as a basis for employment decisions affecting Plaintiff and/or such conduct had the purpose or effect of unreasonably interfering with Plaintiff's performance of her job and/or creating a hostile, intimidating or offensive work environment.

157.    As pleaded above, Defendant failed to take reasonable steps to prevent the conduct or to address it after Defendant knew of it or should have known of it.

158.    Further, in the alternative, Defendant failed to take reasonable steps to prevent or to correct promptly the harassing behavior; and Plaintiff did not fail to take advantage of any

available preventive or corrective opportunities or to otherwise avoid the harm. In fact, Defendant disciplined Plaintiff for complaining about the racial harassment and took other materially adverse actions against Plaintiff for her protected activity in opposing racially discriminatory or harassing behavior or in opposing unlawful retaliatory actions or harassment.

159.    As pleaded above, Defendant's violation of Title VII injured and damaged the Plaintiff so that Plaintiff suffered damages caused by the Defendant's retaliation and harassment.

160.    Defendant has intentionally, deliberately, willfully, and callously disregarded the rights of Plaintiff.

161.    By reason of the Defendant's retaliation, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 2000e, *et seq.*

162.    Defendant is liable to Plaintiff for compensatory damages, including for injury from humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, backpay, equitable relief, injunctive relief, attorney's fees, expenses, costs and such other damages and relief as the jury or the Court determine to be appropriate.

### THIRD CAUSE OF ACTION
### RACE DISCRIMINATION
### IN VIOLATION OF 42 U.S.C. § 1981(a)-(b) (§ 1981)

163.    Plaintiff repeats, re-alleges, and incorporates the Paragraphs above as if fully set forth herein.

164.    Defendant discriminated against Plaintiff on the basis of her race in violation of § 1981(a) of 42 U.S.C. § 1981(a) ("§ 1981").

165.    As pleaded above, Defendant's race discrimination and harassment included adverse actions. Defendant discriminated against Plaintiff because of her race, African-

American and Black. Plaintiff was also selected for termination based on her race.

166.    As pleaded above, Defendant also subjected Plaintiff to a racially hostile work environment and then retaliated against Plaintiff for complaining about it. The harassment was severe or pervasive.

167.    As pleaded above, Plaintiff subjectively did find, and a reasonable person as well would have found, the racially harassing conduct to be offensive and severe or pervasive.

168.    As pleaded above, the racial harassment and conduct was such that submission to or rejection of it constituted a term and condition of Plaintiff's employment, submission to or rejection of such unlawful conduct was used as a basis for employment decisions affecting Plaintiff and/or such conduct had the purpose or effect of unreasonably interfering with Plaintiff's performance of her job and/or creating a hostile, intimidating or offensive work environment.

169.    As pleaded above, Defendant failed to take reasonable steps to prevent the conduct or to address it after Defendant knew of it or should have known of it.

170. Defendant disciplined Plaintiff for complaining about the racial harassment.

171.    As pleaded above, Defendant's unlawful conduct injured and damaged the Plaintiff so that Plaintiff suffered damages caused by the racial discrimination and harassment.

172.    Defendant has intentionally, deliberately, willfully, and callously disregarded the rights of Plaintiff.

173.    By reason of the Defendant's unlawful conduct, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 1981.

174.    Defendant is liable to Plaintiff for compensatory damages, including for injury from humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, backpay, equitable

relief, injunctive relief, attorney's fees, expenses, costs and such other damages and relief as the jury or the Court determine to be appropriate.

## FOURTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981(a)-(b),
## (§ 1981 )

175.    Plaintiff repeats, re-alleges, and incorporates the Paragraphs above as if fully set forth herein.

176.    Defendant retaliated against Plaintiff in violation of § 1981. Specifically, Defendant retaliated against Plaintiff for opposing race discrimination and harassment and for opposing unlawful retaliation and harassment and availing herself of internal complaints process regarding race discrimination and harassment and/or retaliation in the workplace, protected activity by § 1981, and thereby subjecting her to the unlawful retaliation, including an unpaid suspension, other materially adverse actions and eventually unlawful termination as described herein.

177.    As pleaded above, Defendant's retaliation included adverse actions. The Defendant retaliated against Plaintiff for participating in protected activity and availing herself of Defendant's internal EEO process, and by subjecting her to materially adverse employment actions including unlawful termination. These actions were such that they would tend to dissuade a reasonable person from engaging in protected activity in opposing the unlawful activity of Defendant.

178.    As pleaded above, Defendant also subjected Plaintiff to a hostile retaliatory work environment by both co-workers and supervisors and then further retaliated against Plaintiff for complaining about it. The retaliation included tangible employment losses and actions.

179.    As pleaded above, the retaliatory harassment was severe or pervasive. Further,

Plaintiff subjectively did find, and a reasonable person as well would have found, the retaliatory harassing conduct to be offensive and severe or pervasive.

180.     As pleaded above, the retaliatory harassment and conduct was such that submission to or rejection of it constituted a term and condition of Plaintiff's employment, submission to or rejection of such unlawful conduct was used as a basis for employment decisions affecting Plaintiff and/or such conduct had the purpose or effect of unreasonably interfering with Plaintiff's performance of her job and/or creating a hostile, intimidating or offensive work environment.

181.     As pleaded above, Defendant failed to take reasonable steps to prevent the conduct or to address it after Defendant knew of it or should have known of it.

182.     Further, in the alternative, Defendant failed to take reasonable steps to prevent or to correct promptly the harassing behavior; and Plaintiff did not fail to take advantage of any available preventive or corrective opportunities or to otherwise avoid the harm. In fact, Defendant disciplined Plaintiff for complaining about the racial harassment and took other materially adverse actions against Plaintiff for her protected activity in opposing racially discriminatory or harassing behavior or in opposing unlawful retaliatory actions or harassment.

183.     As pleaded above, Defendant's violation of section 1981 injured and damaged the Plaintiff so that Plaintiff suffered damages caused by the Defendant's retaliation and harassment.

184.     Defendant has intentionally, deliberately, willfully, and callously disregarded the rights of Plaintiff.

185.     By reason of the Defendant's retaliation, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 1981.

186.     Defendant is liable to Plaintiff for compensatory damages, including for injury

30

from humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, punitive damages, backpay, equitable relief, injunctive relief, attorney's fees, expenses, costs and such other damages and relief as the jury or the Court determine to be appropriate.

## VII.  PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs pray as follows:

A.    Declare and adjudge that Defendant violated Plaintiff's rights under 42 U.S.C. § 2000e, *et seq.*

B.    Declare and adjudge that Defendant violated Plaintiff's rights under 42 U.S.C. § 1981, *et seq.*

C.    Order Defendant to return Plaintiff to her former position of employment with Defendant;

D.    Order Defendant to immediately cease and desist from all retaliatory and discriminatory behavior as described in this Complaint;

E.    Award Plaintiff compensatory damages, including appropriate backpay, based on a rate of pay equating to approximately $82,000 per year plus benefits, and including but not limited to, unpaid social security matching payments, unpaid entitlements, bonuses, and contributions to her retirement account(s);

F.    Award an amount to offset additional tax liability incurred by Plaintiff for any award of back-pay which she would not have incurred had she received pay and benefits from Defendant in the regular course of employment;

G.    Award Plaintiff compensatory damages, including emotional pain and suffering

of at least $2,000,000;

H.    Award of all out-of-pocket expenses and debts incurred by Plaintiff for this litigation;

I.    Award Plaintiff punitive damages of at least $4,000,000;

J.    Award Plaintiff the costs of this action and reasonable attorney's fees, expenses and costs;

K.    Award Plaintiff pre-judgment and post-judgment interest on the foregoing sums;

L.    Award Plaintiff such other relief as the Court deems just and proper, including the award of costs and fees.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

**Respectfully submitted,**

s/Steve Wilson
Steve Wilson (Tenn. Bar. No. 28460)
5100 Poplar Ave., Ste. 2700
Memphis, TN 38137
Tel: 901-337-1300
Fax: 901-372-1446
steve@stevewilsonfirm.com

s/ John W. Simmons_____
John W. Simmons (Tenn. Bar No. 012248)
Simmons Law Firm, PLLC
8295 Tournament Drive Ste. 150
Memphis, TN 38125
Telephone: 901-496-8415
Email: jwadesimm850@outlook.com

*Counsel for Plaintiff*